## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 15-cr-00149-RM

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

2. **PAMILA LUCERO**,

        Defendant.

_____

## DEFENDANT LUCERO'S RESPONSE TO GOVERNMENT'S SENTENCING BRIEF RE LOSS CALCULATION

_____

The Defendant, Pamila Lucero, by and through counsel, John Henry Schlie, hereby responds to the Government's Sentencing Brief Re Loss Calculation as follows:

The Court requested that the Government provide a breakdown of the amounts included in its proposed intended loss figure of $565,396 and its purported legal basis for the inclusion of the figure in each "pot" making up the total intended loss number. The Government filed its Sentencing Brief Re Loss Calculation with Exhibit 1A ("Specified Categories of Returns Attributed to Lucero"), which attempts to provide that breakdown, although the amount in each category cannot be determined by the document.  Exhibit 1A does however identify the returns the Government contends are in each of the requested categories and its proposed totals for intended loss ($565,396) and actual loss ($277,586.66) for guideline and restitution calculation purposes.

The Government first contends that "before measuring *intended* loss under U.S.S.G. § 2B1.1 (the amount inside the Pot), the Court must first measure the scope

of the loss (the actual size and shape of the Pot) pursuant to § 1B1.3",  referring to the
application sequence proscribed in U.S.S.G. § 1B1.1   (Government Sentencing Brief,
page 4, second paragraph).  Ms. Lucero agrees that the Court needs to adhere to the
application sequence in  § 1B1.1 but disagrees with the notion that  § 1B1.1 provides
the Government with the solution it seeks.  § 1B1.1 does not refer to the concept of
relevant conduct under § 1B1.3 but rather instructs the user to determine the applicable
offense guideline and then follow those provisions to determine the base offense level,
appropriate specific offense characteristics, applicable cross references and special
instructions.   It is the determination of the Specific Offense Characteristic for loss that
is the crux of the issue here.

Application Note 3 in the Commentary to § 2B1.1 ("Failure to follow such
commentary could constitute an incorrect application of the guidelines..." § 1B1.7)
explains how the Specific Offense Characteristic for loss is to be determined.
Application Note 3(A) states the General Rule that, subject to the exclusions in
subdivision (D) (which do not apply here), "loss is the greater of actual loss or intended
loss."  The actual loss number is not being disputed at $277,586.66.  The question is
whether the intended loss exceeds the actual loss figure and, if so, whether that
number exceeds $550,000 which would result in the additional 2 level increase.

Application Note 3(A)(ii), which defines intended loss, was amended on
November 1, 2015 to clarify its application.  It now states in relevant part: "'Intended
loss' (1) means the pecuniary harm that the defendant purposely sought to inflict...."
(emphasis added). Thus, intended loss requires a finding of the subjective intent of Ms.
Lucero.  The Sentencing Commission stated in its Supplement to Appendix C to the

2

United States Sentencing Guidelines, Amendment 792, "[t]he amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability."  (emphasis added).

Although decided prior to the clarification by the Commission, the leading case in the Tenth Circuit on the application of intended loss under  Application Note 3 to § 2B1.1 is U.S. v. Manatau, 647 F.3d 1048, 1050 -1057 (10th Cir. 2011), wherein the Court stated:

> We hold that "intended loss" means a loss the defendant *purposely* sought to inflict. "Intended loss" does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated. *Id*. at 1050.

In giving further meaning to "intended" loss, the Court went on to say:

> the sentencing commission's definition offers us no reason to think it wished us to apply anything other than the word's ordinary meaning. If anything, the commission's (repeated) use of the word "intended" to define itself suggests that the commission thought the word's meaning was pretty plain. And in contemporary usage, it is. Something is intended if it is done on purpose—not merely known, foreseen, or just possible or potentially contemplated. 7 Oxford English Dictionary 1074 (2d ed. 1989); Webster's Ninth New Collegiate Dictionary 629 (1985) (defining "intend" as "to have in mind as a purpose or goal"). "That knowledge [alone] is sufficient to show intent is emphatically *not* the modern view." Giles v. California, 554 U.S. 353, 368, 128 S.Ct. 2678, 171 L.Ed. 2d 488 (2008); *see also* Wayne R. LaFave, *Substantive Criminal Law* § 5.2(b) at 343 (2d ed. 2003). The difference between these two mental states—between intent and knowledge —is, put simply, the difference "between a man who wills that a particular act or result take place [intent] and another who is merely willing that it should take place [knowledge]." MPC § 2.02 cmt. 2 at 233 n. 6 (quoting 1 Brown Comm'n Working Papers 124). It is the difference between a utility that provides telephone service to a customer "knowing it is used for bookmaking" and someone else who strings a telephone wire in order to set up the bookmaking operation; the difference

3

between a "farm boy [who] clears the ground for setting up a still, knowing that the venture is illicit" but just looking for a paying day's work, and someone who clears the ground in order to work a still. MPC § 2.06 cmt. 6(c) at 316. *Id.* at 1050-1052.

Here, the Government cannot even prove Ms. Lucero's knowledge of the tax returns in the final category of returns, to say nothing of intent by Ms. Lucero that she purposely sought to inflict pecuniary harm for a significant number of the tax returns it seeks to include in the intended loss figure. Starting on page 10 of Exhibit 1A, the government includes 60 returns with the stated basis of "[n]ot a product of discussion, but submitted during the defendant's involvement, within the scope of her agreement, and reasonably foreseeable to her." This means that these 60 returns attributed to intended loss were not returns where Ms. Lucero cashed the resulting refund checks, provided addresses for the returns or even discussed with Mr. Caraveo or anyone else. The Government has no evidence that Ms. Lucero had knowledge of those 60 returns or any intent to inflict pecuniary harm related to those returns. Therefore, those 60 returns are not includable in intended loss and need to be deducted from the total. Ms. Lucero estimates that the total for these 60 returns is approximately $164,182, but even a cursory review yields the conclusion that they decrease the Government's number for intended loss to well below $550,000.

The Government's argument that the intended loss should include all relevant conduct is not well taken. Even § 1B1.3(a) begins with the statement "[u]nless otherwise specified." The concept of relevant conduct is expressly included in the actual loss analysis and conspicuously absent in the intended loss analysis. A comparison of the language used for actual loss and intended loss, and "pecuniary harm" and

4

"reasonably foreseeable pecuniary harm", a distinction cited by the Tenth Circuit in Manatau, 647 F.3d at 1051, yields that obvious conclusion.

The cases cited by the Government in its Sentencing Brief are for the most part not on point for the issue before this Court.  United States v. Holbert, 285 F.3d 1257 (10th Cir. 2002), involves a conviction for possession of a firearm following a conviction for a misdemeanor involving domestic violence in violation of 18 U.S.C. § 922(g)(9).  It contains no discussion or ruling as to the determination of actual or intended loss under §2B1.1.

United States v. Gonzales, No. CR 14-0922, 2016 WL 815614 (D.N.M. Feb. 16, 2016), a District Court opinion of no binding precedent is quite frankly a bit difficult to interpret on the present issue.  First, it is clear that at the sentencing hearing, although Mr. Gonzales initially objected to the use of the intended loss number rather than the actual loss number, he withdrew that objection. *Id.* at *12.  Further, there does not appear to have been any argument that the intended loss number included transactions whose pecuniary harm Mr. Gonzales did not purposely seek to inflict.  At * 23, the citation used by the Government, the district court cites Holbert, *supra,* as did the Government here, for the proposition that the distinction between the use of the terms "offense of conviction" and "offense" is significant in seemingly concluding that intended loss includes relevant conduct, even though that conclusion was not necessary for the issues presented.  However, Application Note 3(A)(ii) for intended loss does not include either term.  Application Note 3(A)(i) for actual loss does use the term "offense", again indicating the Commission's intention that actual loss should include relevant conduct whereas intended loss should be limited to the "pecuniary harm the defendant

5

purposely sought to inflict."   The Gonzales Memorandum Opinion and Order fails to even cite Manatau, *supra,* in its analysis, enforcing the argument that the issue of concern to the court was not the difference between actual and intended loss calculations.

In United States v. Treadwell, 539 F. 3d 990, 1002 (9th Cir. 2010), the Ninth Circuit only analyzed an actual loss calculation attributed to individual defendants. *Id* at 1002 -1004.  United States v. Read, 710 F. 3rd 219, 230 (5th Cir. 2012), actually favors Ms. Lucero's position, although it does not go into an actual vs. intended loss analysis. In Read,  the government urged that the loss amount was $7,639,279.74—the full amount billed to the victims— but the district court determined this could not be the "intended loss" because the Reads knew that some claims would be rejected. Instead, the district court used the "actual loss" of $1,766,681.31—the amount that Medicare, Medicaid, and BCBS paid on the claims submitted. The 5th Circuit upheld the district court's analysis. *Id* at 230-231.

United States v. Brownell, 495 F. 3d 459, 461-462 (7th Cir. 2007), comes the closest to supporting the Government's position in that it seemingly applies reasonably foreseeable conduct to an intended loss calculation. *Id*.  However, it should be noted that Brownell occurred well before the opinion in United States v. Yihao Pu, 814 F.3d 818, 824 (7th Cir. 2016), wherein the Court found specifically on point:

> The general rule is that the district court determines the greater of actual or intended loss. U.S.S.G. § 2B1.1 n. 3(A) (2014). The guidelines define intended loss as "the pecuniary harm that was intended to result from the offense," which "includes intended pecuniary harm that would have been impossible or unlikely to occur." *See id.* at n. 3(A)(ii). Pecuniary harm is monetary harm or a harm that is readily measurable in money; it does not

include non-economic harm. *Id.* at n. 3(A)(iii). "Intended loss analysis, as the name suggests, turns upon how much loss the defendant actually intended to impose" on the victim, regardless of whether the loss actually materialized or was even possible. *United States v. Higgins,* 270 F.3d 1070, 1075 (7th Cir.2001); *see also United States v. Middlebrook,* 553 F.3d 572, 578 (7th Cir.2009) ("[T]he true measure of intended loss [is] in the mind of the defendant."). The phrase "result from" imposes a requirement of but-for causation. *See Burrage v. United States,*____ U.S. ____, 134 S.Ct. 881, 886–88, 891, 187 L.Ed.2d 715 (2014) (finding when a statute does not define the phrase "result from," the court should give it its ordinary meaning, which is actual or but-for causation). Finally, if a loss occurred but the sentencing court cannot reasonably determine the amount of the loss, it may use the gain that resulted from the offense as an alternative measure to estimate the loss amount. *See* U.S.S.G. § 2B1.1 n. 3(B).  (Footnote omitted).

Finally, <u>United States v. Bent</u>, 445 Fed Appx 487, 491 (3rd Cir. 2011), does not involve an actual vs. intended loss analysis.

In addition to the above, Exhibit 1A has other problems.  Starting on page 6, the spreadsheet contains those tax returns the Government claims to be included based on phone calls between Ms. Lucero and Mr. Caraveo.  The first five of those returns are included because "[p]hone call between Lucero and Caraveo on 06/03/10 @ 2003hrs.  The two talk about the Douglas Street address.  Lucero and Caraveo try to reason as to why the checks are taking longer to arrive."  The difficulty with these bases is that the five tax returns at issue were received by the IRS on August 2, 2010 and September 23, 2010.  How can Ms. Lucero and Mr. Caraveo be discussing checks resulting from these five returns taking longer to arrive on June 3rd, when the IRS didn't even receive the returns until two and three months later?

Similarly, the last two tax returns on Page 8, and the first return on Page 9, state the bases as "[p]hone call on 07/14/2014@ 1434 hrs between Lucero and Caraveo.  Discussion of inmate Adam Ybarra's mother Stephanie.  Caraveo instructs Lucero to

contact Stephanie concerning refund check Stephanie received."  However, the threee

tax returns were all received on November 7, 2013, nine months before the purported

phone calls, and none of them resulted in a refund check being issued.

Finally, the basis of "[p]hone call on 12/02/2012 @ 1956hrs between Lucero and

Caraveo.  Caraveo told Lucero that he wanted her to contact C. Aragon and explain to

her how to prepare false tax returns.  The Knight returns were received by the IRS

approx 2 weeks later." is used for nine consecutive tax returns on Pages 9 -10.

Although three of those tax returns are in fact for David Knight, the remaining six

returns involved Jonathan Hall and John Toole and their receipt by the IRS on

November 7, 2010, predated the phone call by three weeks.

The Government has failed to establish by a preponderance of the evidence that

Ms. Lucero purposely sought to inflict pecuniary harm over $550,000.  Therefore, the

appropriate increase for the loss Specific Offense Characteristic should be 12, not the

14 level increase contained in the Presentence Investigation Report.

Respectfully submitted this 13th day of July, 2016.

> s/ John Henry Schlie
> **John Henry Schlie**
> John Henry Schlie, P.C.
> 5105 DTC Parkway, Suite 450
> Greenwood Village, Colorado 80111
> Telephone: (303) 830-1616
> FAX: (303) 220-8150
> E-mail: johnhenry@schlielawfirm.com
> ATTORNEY FOR DEFENDANT
> PAMILA LUCERO

## CERTIFICATE OF SERVICE

I hereby certify that on July 13,  2016, I electronically filed the foregoing

**DEFENDANT LUCERO'S RESPONSE TO GOVERNMENT'S SENTENCING BRIEF**

**RE LOSS CALCULATION** with the Clerk of Court using the CM/ECF system which will

send notification of such filing to the following e-mail addresses:

>Assistant United States Attorney Martha A. Paluch
>martha.paluch@usdoj.gov
>
>Assistant United States Attorney Bryan D. Fields
>Bryan.Fields3@usdoj.gov
>
>Martin Stuart, Esq.
>mstuart@portmanstuart.com
>
>Marci Gilligan LaBranche, Esq.
>labranche@ridleylaw.com
>
>Thomas Ward, Esq.
>tward@wardlawdenver.com
>
>Robert Pepin, Esq.
>Robert_Pepin@fd.org
>
>John Mosby, Esq.
>john_mosby@msn.com
>
>David Owen, Jr., Esq.
>davidowen@lodopc.com
>
>John F. Sullivan, III. Esq.
>jfslaw1@aol.com
>
>U.S. Probation Officer Nicole Peterson
>Nicole_Peterson@cod.uscourts.gov

>s/ John Henry Schlie
>John Henry Schlie